185 N.J. Super. 457 (1982)
449 A.2d 553
LINCOLN FEDERAL S. & L. ASSOC., A CORPORATION OF THE UNITED STATES OF AMERICA, PLAINTIFF,
v.
PLATT HOMES, INC., ET AL., DEFENDANTS.
Superior Court of New Jersey, Chancery Division Hunterdon County.
Decided June 17, 1982.
*458 James Flynn for plaintiff (Snevily, Ely & Williams, attorneys).
John Phillips for defendants Robert D. Hedges and Irene Hedges (Buttermore, Mullen, Jeremiah & Phillips, attorneys).
DREIER, J.S.C.
This case, which comes before the court on cross-motions for summary judgment, presents a single, clearly defined issue: Does the lien for an optional second advance of funds under a previously recorded construction mortgage take priority over the *459 lien of an intervening encumbrance which was recorded but of which the construction lender had no actual notice? This court answers the question in the negative.
The operative facts are as follows. Defendant Platt Homes, Inc. (Platt) owned five lots which it planned to develop. In January 1979 defendant Hedges lent Platt $20,000 in return for a 40% share of the profits from the development of lot 1.10. In May 1979 Platt obtained a construction loan on lot 1.10 from plaintiff Lincoln Federal Savings & Loan Association (Lincoln) providing for discretionary advances of $94,500. This mortgage was recorded and an initial advance of $39,500 was made. On July 26, 1979 Hedges lent an additional $10,000 to Platt, and their earlier profit-sharing agreement was altered to reflect a $40,000 mortgage from Platt to Hedges, which mortgage was recorded on July 30, 1979.[1] On August 9, 1979 Lincoln made a second advance of $27,200. Although a run-down search on lot 1.10 had been ordered, it apparently failed to disclose Hedges' intervening lien on the property. Platt since defaulted on both mortgages, and the dispute here is as to the priorities of Lincoln's and Hedges' liens. Hedges concedes the priority of Lincoln's initial advance under its construction mortgage, but contends that his intervening mortgage is superior to Lincoln's $27,200 second construction advance by virtue of its being recorded ten days before Lincoln exercised its option to make the advance.
The question raised by these facts has not been squarely addressed since 1864, when Ward v. Cooke, 17 N.J. Eq. 93, 99-100 (Ch. 1864), held (under a predecessor to our present recording act) that a recorded mortgage given to secure discretionary future advances will be accorded superiority only as to those advances made prior to actual notice of any intervening encumbrance. *460 Mere constructive notice was held insufficient to subordinate such advances to an intervening lien. Although the rule of Ward v. Cooke has been frequently quoted in dicta,[2] no court since 1864 has been called upon to apply the rule to the precise facts that engendered it. Thus the effect of the rule has never had to be evaluated in the light of later recording acts, specifically the Recording Act of 1898 and our present recording statute, N.J.S.A. 46:21-1 et seq., which is substantially based thereon. In view of the strong public policy favoring the certainty derived from recording, expressed in numerous cases decided under these latter acts, it is time to reconsider the effect of constructive notice on the priority positions of the mortgagee making optional future advances and the intervening lienholder. To do so, however, requires a brief synopsis of the case law dealing with advance money construction mortgages, measured against the parameters of actual or constructive notice, and obligatory or optional advances.
It is settled law in New Jersey that Lincoln's lien on the subject property applies only to the extent of monies actually advanced pursuant to the terms of the construction mortgage, and not as to the face amount of the mortgage itself. Mayo v. City Nat'l Bank & Trust Co., 56 N.J. 111 (1970); Grennon v. Kramer, 111 N.J. Eq. 337 (E. & A. 1932); Ward v. Cooke, supra, 17 N.J. Eq. at 99; Bell v. Fleming's Ex'rs, 12 N.J. Eq. 13 (Ch. 1858), aff'd, 12 N.J. Eq. 490 (E. & A. 1859); Griffin v. New Jersey Oil Co., 11 N.J. Eq. 49 (Ch. 1855). As to advances made *461 after the recording of an intervening lien, however, the analysis frequently focuses on whether the advances were obligatory or optional. This distinction was drawn in Micele v. Falduti, 101 N.J. Eq. 103 (Ch. 1927):
The general rule, as I understand it, therefore, is that a mortgage for future advances becomes an effective lien as to subsequent encumbrances from the date of its record, where the making of advances . .. is obligatory. But, where the making of future advances is not obligatory, but optional, the mortgage is a prior lien to all subsequent encumbrances until there is actual notice to the mortgagee as distinguished from constructive notice. [At 105]

I

Obligatory Advance  Constructive or Actual Notice
No reported decision examines the effect of actual notice of intervening liens on the priority of obligatory future advances. Central Trust Co. v. Continental Iron Works, 51 N.J. Eq. 605 (E. & A. 1893), stated in dictum:
... mortgages for future advances operate from the time of recording, although the advances may not be made until a subsequent date, and they have priority for all advances made before actual notice of subsequent encumbrances. [At 607; citations omitted; emphasis supplied]
This seems to imply that actual notice will subordinate any future advance to an intervening encumbrance. However, as noted in 4 Pomeroy, Equity Jurisprudence (5 ed. 1941), § 1199 at 593, n. 15, courts applying the above rule do so without acknowledging a distinction between obligatory and optional advances. This was in fact the case in Central Trust Co., which furthermore considered the effect of constructive notice of intervening mechanics' liens on the priority position of holders of mortgage bonds which were not issued until some months after the mortgage securing them was recorded and the mechanics' liens attached.
In Micele v. Falduti, supra, 101 N.J. Eq. at 104-105, the lending association had "no option whatever" as to the making of future advances. There the court held that constructive notice of an intervening lien would not oust such future advances from their position of priority; the effectiveness of the *462 lien imposed by a mandatory future advance would relate back to the date the mortgage was recorded. The rationale for this rule is the equitable maxim that what has been agreed to be done shall be regarded as done. Thus, where the mortgagee is committed under a recorded mortgage to lend a specific sum, and where several advances are required to consummate the agreement, the court will give effect to the manifest intention of the parties and will treat the successive advances as a single transaction, fixed and effective as of the date the original commitment was recorded. 101 N.J. Eq. at 104, 105; Central Trust Co. v. Continental Iron Works, supra, 51 N.J. Eq. at 608.[3]

II

Optional Advance  Actual Notice
When the future advance is optional on the part of the mortgagee, the rule is clear: actual notice of an intervening encumbrance will work a subordination of any advances made after such notice is received. See cases cited supra in footnote 2. Unlike the obligatory advance situation, the discretionary lender can protect himself by refusing to make the advance unless he can maintain his priority status as first lienholder.
The so-called "obligatory" advance in Mayo v. City Nat'l Bank & Trust Co., supra, 56 N.J. at 117, properly falls into this optional advance/actual notice category for purposes of analysis. Mayo considered the propriety of defendant construction mortgagee's disbursement of monies under a fifth advance  specifically, *463 whether payments to an intervening mechanic's lienor and to a second mortgagee took precedence over an earlier assignment of a portion of the advance made by the construction mortgagor. An examination of the briefs filed in the Mayo appeal indicates that the assignee  Mayo  argued unsuccessfully that defendant did not need to pay to obtain the subordination of the intervening encumbrances in order to maintain its priority position, despite the fact that defendant had actual notice of the intervening encumbrances, because the advance was obligatory. Under the terms of the construction mortgage, however, defendant was obliged to advance future funds only if it continued to hold a first lien as to such advances. Since defendant had actual notice of the intervening encumbrances, it had three choices: not to lend; to lend on condition that the proceeds went to obtain the subordination of the intervening lienholders; or to lend without taking action to preserve its priority status. This type of "conditionally obligatory" advance is in substance and effect optional. The court in Mayo recognized this, stating:
Where it is optional with the mortgagee whether to make future advances, he does not have a prior lien for those advances made after notice of an existing encumbrance. Germania Bldg. & Loan Assn. v. B. Fraenkel Realty Co., 82 N.J. Eq. 49 (Ch. 1913), aff'd, 84 N.J. Eq. 164, 199 (E. & A. 1914).
Mayo therefore found that defendant's application of the monies from the fifth advance was proper, being necessary to secure its priority position as required by the mortgage. See, also, Germania B. & L. Ass'n v. B. Fraenkel Realty Co., supra.

III

Optional Advance  Constructive Notice
Up until now a different rule has obtained as to the effect of constructive notice of intervening liens on optional advances. Ward v. Cooke, supra, states:
A mortgage given to secure future advances, duly registered, is good, not only as against the mortgagor, but is entitled to priority over subsequent encumbrances *464 for all advances made prior to notice of the subsequent encumbrance. [Citations omitted].
And the notice must be an actual, not a constructive notice. [17 N.J. Eq. at 99 Emphasis in text].
The facts in the case at bar place it squarely under this rule: Lincoln, the construction mortgagee, had only record notice of Hedges' lien, and the terms of the mortgage authorized Lincoln, "in its sole judgment and discretion," to determine the time and amount of any advances. Thus, under Ward v. Cooke, Lincoln's second advance of $27,200 would not be subordinate to Hedges' $40,000 mortgage. This court, however, chooses not to follow the holding of Ward v. Cooke, given the language of New Jersey's present recording act, N.J.S.A. 46:21-1 et seq., and the policy expressed in the cases decided thereunder.
As noted earlier, Ward v. Cooke is the sole case stating the rule as a holding, rather than as dictum. And Ward v. Cooke was decided under the pre-1898 version of our recording act, which early version did not express our present strong policy favoring the protection accorded to recording. Rather, in these early acts, a deed, mortgage or other similar instrument was void as to subsequent purchasers or lienors unless registered within 15 days of execution or unless the subsequent claimant had actual notice. Compiled Statutes of New Jersey 1709-1910, § 53 et seq., "Conveyances," at 1554.
The recording act was substantially redrafted in 1898, and the present version is, in language and purpose, a continuation of that legislation. The applicable sections of the present act read:
Except as otherwise provided herein or in chapter 9 of Title 12A of the New Jersey statutes, whenever any deed or instrument of the nature or description set forth in section 46:16-1 of this Title, which shall have been or shall be duly acknowledged or proved and certified, shall have been or shall be duly recorded or lodged for record with the county recording officer of the county in which the real estate or other property affected thereby is situate or located such record shall, from that time, be notice to all subsequent judgment creditors, purchasers and mortgagees of the execution of the deed or instrument so recorded and of the contents thereof. [N.J.S.A. 46:21-1, emphasis supplied]
........

*465 Every deed or instrument of the nature or description set forth in section 46:16-1 of this title shall, until duly recorded or lodged for record in the office of the county recording officer in which the affected real estate or other property is situate, be void and of no effect against subsequent judgment creditors without notice, and against all subsequent bona fide purchasers and mortgagees for valuable consideration, not having notice thereof, whose deed shall have been first duly recorded or whose mortgage shall have been first duly recorded or registered; but any such deed or instrument shall be valid and operative, although not recorded, except as against such subsequent judgment creditors, purchasers and mortgagees. [N.J.S.A. 46:22-1]
According to these provisions, Lincoln was charged with notice of Hedges' mortgage from the time it was lodged for record with the clerk, and so Lincoln made its second construction advance at its peril. Thus, Lincoln assumed the status of subsequent mortgagee under the terms of N.J.S.A. 46:21-1. To hold otherwise would put the construction lender who disburses funds without taking the precaution of ordering a search, in a better position than the lender who seeks a new search before each advance.[4] Lincoln claims that it ordered a run-down search to the date of the second advance, but that no intervening liens were revealed. Since there is no dispute that Hedges' mortgage was recorded ten days before, Lincoln's proper remedy is against the title company or searcher who overlooked Hedges' mortgage.
This result, which puts constructive notice on a par with actual notice, is in accord with the words of the recording act itself, and with the cases interpreting it. Palamarg Realty Co. v. Rehac, 80 N.J. 446 (1979), stated that:

*466 Generally speaking, and absent any unusual equity, a court should decide a question of title ... in the way that will best support and maintain the integrity of the recording system. [At 453]
The rule may be applied by analogy to cases considering the notice effect of recorded mortgages. In fact, the recording act was so construed in a mortgage situation in New Jersey Bank v. Azco Realty Co., Inc., 148 N.J. Super. 159 (App.Div. 1977). There the court found that a mortgage, recorded on Friday, July 19, 1974, had priority over one executed on Monday, July 22, 1974, even though a run-down search to July 22 could not possibly have revealed the earlier lien because of administrative delays in the clerk's office. The court said:
Public policy requires that the Recording Act should be strictly construed:
An historical study of the Act, as well as an analysis of the cases interpreting it, leads to the conclusion that it was designed to compel the recording of instruments affecting title, for the ultimate purpose of permitting purchasers to rely upon the record title and to purchase and hold title to lands within this state with confidence. The means by which the compulsion to record is accomplished is by favoring a recording purchaser, both by empowering him to divest a former non-recording title owner and by preventing a subsequent purchaser from divesting him of title. This ability to deprive a prior and bona fide purchaser for value of his property shows a genuine favoritism toward a recording purchaser. It is a clear mandate that the recording purchaser be given every consideration permitted by the law, including all favorable presumptions of law and fact. It is likewise a clear expression that a purchaser be able to rely upon the record title. [Jones, "The New Jersey Recording Act  A Study of its Policy," 12 Rutg.L.Rev., 328, 329-330 (1958)]
Here, plaintiff's mortgage was clearly of record prior to defendant's. Good practice and common sense require that no disbursement should be made on a mortgage until there is a bring-down search showing a recording of the instant mortgage with no intervening equities. The Recording Act requires no less. Deficiencies in procedures in the county clerk's office which prevent discovery of documents `lodged for record' should not deprive a validly lodged security instrument of its priority. [148 N.J. Super. at 166-167]
A recording act is clearly intended to provide "an unequivocal method of establishing priorities with certainty and without opening the flood gates of litigation, no more or no less." Shallcross v. Community State Bank & Trust Co., 180 N.J. Super. 273, 281 (Law Div. 1981). In view of this clear policy, this court holds that constructive notice of intervening liens is *467 sufficient to defeat the priority position of a construction mortgagee as to optional future advances. Thus, the optional advance becomes, in effect, a new mortgage taken as of the time such advance is made.[5] The construction lender may protect his equity in the property by making a run-down search on the subject premises, and by obtaining the subordinations of any intervening lienholders revealed thereby, before releasing additional funds.[6]
NOTES
[1] Although only a total of $30,000 was lent, $40,000 was to be repaid. The consideration for the additional $10,000 was Hedges' relinquishment of his 40% share of profits and his forebearance to charge a fixed rate of interest on the loan.
[2] See Mayo v. City Nat'l Bank & Trust Co., 56 N.J. 111 (1970); Passaic Nat'l Bank & Trust Co. v. Owens, 111 N.J. Eq. 486 (E. & A. 1932); Micele v. Falduti, 101 N.J. Eq. 103 (Ch. 1927); Germania B. & L. Ass'n v. B. Fraenkel Realty Co., 82 N.J. Eq. 49 (Ch. 1913), aff'd 84 N.J. Eq. 164 (E. & A. 1914); Porch v. Agnew, 70 N.J. Eq. 328 (Ch. 1905), aff'd 72 N.J. Eq. 319 (E. & A. 1906); Central Trust Co. v. Continental Iron Works, 51 N.J. Eq. 605 (E. & A. 1893); Lanahan v. Lawton, 50 N.J. Eq. 276 (Ch. 1892); Heintze v. Bentley, 34 N.J. Eq. 562 (E. & A. 1881); Jacobus v. Mutual Benefit Life Ins. Co., 27 N.J. Eq. 604 (E. & A. 1876); Platt v. Griffith, 27 N.J. Eq. 207 (Ch. 1876); Macintosh v. Thurston, 25 N.J. Eq. 242 (Ch. 1874). See, also, Shirras v. Caig, 7 Cranch. 34, 51, 3 L.Ed. 260 (1812).
[3] Although this court need not decide the effect of actual notice of an intervening encumbrance on obligatory future advances, it would seem that the above rationale would apply equally in such a situation. Furthermore, where future advances are in fact obligatory, to allow even actual notice to alter usual priorities would be to promulgate an unworkable rule. If a construction mortgagee was absolutely committed to lend $100,000, had already lent $50,000, and had received a demand from the mortgagor for the obligatory final $50,000 advance, should his equity in the property for this advance be jeopardized by receipt of actual notice that a $2,000,000 second mortgage on the subject premises had just been taken?
[4] See, however, the Uniform Commercial Code, N.J.S.A. 12A:9-313(6). This section "expressly gives priority to a construction mortgage recorded before the filing of the fixture security interest, but this priority ... applies only during the construction period leading to the completion of the improvement." Official Comment 4(e). No distinction is made between optional and obligatory construction advances, and, indeed, Official Comment 4(e) states that "both types of advances have the same priority under the section."

See, also, Professor Donald J. Rapson's informative discussion of construction mortgage priorities in the "fixture filing" context of U.C.C. 9-913, in Dreier and Rapson, Secured Transactions Under the Revised Uniform Commercial Code (N.J. Inst. for Continuing Legal Ed. 1981), 75-77.
[5] The court recognizes, however, that this holding cannot apply in general commercial loan situations, where commitments to make future advances may be secured by rapidly fluctuating collateral, such as inventory, accounts receivables or the like, with a mortgage on real property taken as side collateral only. In such situations the position of the first secured party to file is protected as to nonreal property collateral by the Uniform Commercial Code, N.J.S.A. 12A:9-312(5) and 12A:9-312(7). He may then "make subsequent advances without each time having, as a condition of protection, to check for filings later than his." New Jersey Comment 5 to N.J.S.A. 12A:9-312(5). Thus, the lender's priority as to all advances relates back to the time of filing. A real estate mortgage given as additional collateral for such a loan or as security for a guaranty of such a loan is generically different from a construction mortgage, and thus can be governed by different standards.

The U.C.C. statutory scheme dealing with the priority of secured personal property creditors as to future advances is complex and preemptive. The Code's very specific provisions concerning the priority of construction mortgages vis-a-vis security interests in fixtures notwithstanding (see U.C.C. 9-313(6) and the discussion thereof in footnote 4, supra), no such statutory scheme covers the area of construction mortgages. In this latter area, this court merely seeks to acknowledge the public policy established by the recording act, and to establish parity between actual and constructive notice as applied to optional advances under construction mortgages. Given the statutory policy in the area of personal property collateral, the Legislature may well wish to re-study the interrelationship of our real and personal property priority systems to bring our real property priorities in conformity with modern commercial practice. Cf. 4 Pomeroy, Equity Jurisprudence (5 ed. 1941), § 1199 at 597-598.
[6] To the extent that monies from Lincoln's second advance went to discharge liens on the property which were superior to Hedges' mortgage, thereby enhancing Hedges' position with respect to lot 1.10, Lincoln may be entitled to priority, even as to the amount of the optional second advance, on the basis of equitable subrogation. Kaplan v. Walker, 164 N.J. Super. 130 (App.Div. 1978); Montefusco Excavating & Contracting Co., Inc. v. Middlesex Cty., 82 N.J. 519 (1980). Since there is a dispute over the actual disbursement of funds from the second advance, the resolution of this single issue must await trial.